[No. 6720.]

## THE PINNACLE GOLD MINING CO. ET AL. v. POPST ET AL.

1. JUDGMENTS—*Void or Voidable—Collateral Attack*—A decree rendered by a court which has not acquired jurisdiction, and where this absence of jurisdiction appears by the record, is void, and may be assailed directly or collaterally.

If there be any jurisdictional infirmity, not apparent by the record, the judgment is voidable merely, and in full effect until reversed, set aside, or declared void, in an action brought to try the very issue.

Mere error or irregularity though sufficient to reverse the decree on appeal or error brought, has not the effect to render it void.

Where a court proceeds to hear and determine a cause without service made for the period prescribed by statute for defendant's appearance, the judgment is void.

2. ADMINISTRATOR'S SALE OF LAND—*Petition*—The petition of an administrator for leave to sell the lands of his intestate for the payment of debts, which conforms substantially to the requirements of the statute is sufficient.

3. ——*Decree—Presumptions*—It is presumed that the county court in directing the sale of an intestate's land, pursuant to the statute, found from evidence produced at the hearing that the personalty was not sufficient to discharge the decedent's debts, and this finding is not to be overthrown by evidence that the court was mistaken.

The personal estate of the decedent was shown by the inventory and appraisement to have a value largely in excess of his debts. The petition averred that this value was wholly prospective, the property, aside from certain exempt household goods, consisting of mining stock not susceptible of sale at any price. On bill in the district court to vacate the sale, the presumption was indulged that the court heard evidence and found this averment to be true.

4. ——*Relief in Equity—Evidence*—In the same case, there being no evidence that the action of the county court was founded in fraud, *held*, that it was not competent to receive evidence that, in fact, there was no necessity to make sale of the real property to discharge the decedent's debts.

5. ——*Widow's Allowance a Debt*—The widow's allowance is a debt of the estate, for which, if the personalty be insufficient, the lands pertaining to the estate may be sold.

6. PROCESS—*Return—Evidence to Contradict*—To contradict the sheriff's return of the service of *mesne* process, and the recitals of the record declaring service, the evidence must be clear, unequivocal, and sufficient to exclude all reasonable doubt.

The return of the service of a summons was supported by the testimony of the officer who made it, and the attorney who directed it. Testimony of one of the defendants to the proceeding that eleven years prior to his deposition, and when he was a mere boy, necessarily having no conception of the purpose or effect of legal proceedings, he was not served with the summons, no circumstance being shown to fix the occasion in his mind, is not sufficient.

The question being whether the summons was served on the 22nd or 29th of the month, a certified copy from the docket kept in the sheriff's office, showing service on the latter date; the account kept by the keeper of the livery stable at the place of service, showing that the officer who made the return had a certain conveyance on the 29th, it not being shown for what purpose, and the statements of the officer, afterwards made, that whatever appeared in the sheriff's docket was true, *held*, insufficient to overthrow the return which showed service on the 22nd.

The officer's return is not to be impeached by a record kept in his office; nor by his statements orally made at a later date.

7. DISTRICT COURT—*Jurisdiction*—The district court has no jurisdiction to review the judgments of the county court and vacate them for error.

8. EQUITY—*Purchase Bona Fide—Notice—Presumptions*—Where it is sought to set aside the title of one who is admitted to have purchased for value, without actual notice of an alleged fraud invalidating his title, upon evidence of matters putting him upon inquiry, it will not be presumed that inquiry on his part, diligently pursued, would have resulted in the discovery of any other or different facts than those which the complaining party establishes on the trial.

The evidence produced to establish constructive notice examined and held insufficient.

*Appeal from Teller District Court.*—Hon. JAMES OWEN, Judge.

Mr. FRANKLIN E. BROOKS, Mr. MICHAEL B. HURLEY, Mr. GEORGE W. BIERBAUER, Mr. GUY P. NEVITT and Mr. H. ALEXANDER SMITH, for appellants.

Mr. CHARLES C. BUTLER, for appellees.

Mr. JUSTICE GARRIGUES delivered the opinion of the court:

John Popst died intestate May 15, 1895, owning an undivided interest in unpatented mining lode locations in the Cripple Creek district. He left as his heirs, his widow Honora Popst, and eight minor children for whom she was appointed guardian. John Nolon, the administrator, under an order from the county court, sold the estate's interest in the Brindsmaid and Uncle Sam locations at public sale, to Frank Dodson. By mesne conveyances the title to the Brindsmaid passed to Farnsworth, who patented it, and conveyed it to the Pinnacle company, which conveyed a portion to the Flying Cloud company. The Blanche company acquired the Uncle Sam. Before this suit was commenced, two of the children, George M. and John F., became of age and deeded an undivided 1/32, and the widow deeded an undivided 1/6 interest in both locations to S. A. Pipps and W. R. Gillpatrick in consideration for which they were to bear the expense of this litigation. George M. Popst, John F. Popst, Honora Popst, S. A. Phipps and W. R. Gillpatrick individually, and Mary, William, Michael, Hugh, Harry and James Popst minors, by Honora Popst as guardian commenced this suit July 2, 1902, against The Pinnacle Gold Mining Company, The Flying Cloud Gold Mining Company, John Nolon and the Blanche Gold Mining Company. The subject of the action was the Brindsmaid and Uncle Sam locations; the object of the action was to recover the title that had been divested by the administrator's sale of real estate to pay debts. The court found all the issues in favor of the children; also in favor of Phipps and Gillpatrick as to the 1/32 interest conveyed to them by George and John. It found against Honora Popst; also against Phipps and Gillpatrick on the 1/6 interest conveyed by her. It declared the county court judgment void, and ordered it, the administrator's sale, the certificate thereof, order approving it, administrator's deed, patent to Farnsworth, and all the mense conveyances from Dodson to

appellants, annulled and set aside. It found these were clouds which it ordered removed from the title of those in whose favor it found. The Pinnacle and Flying Cloud companies appealed, the Brindsmaid being the only property. affected by the appeal.

There were four issues involved, first, that the county court acquired no jurisdiction over the proceedings to sell real estate to pay debts, because the petition failed to state necessary jurisdictional facts, and the order contained recitals showing the court acted without jurisdiction. Second, that no summons was in fact served on the children, though the decree recites, and the return shows they were personally served. Third, that the summons was not in fact served ten days prior to November 2, 1895, though the return shows and the decree finds ten days prior service. Fourth, that the purchaser at the administrator's sale fraudulently purchased the locations for the administrator and his associates, for an inadequate price, of which fraud appellants had notice. The district court made no specific findings on any issue; but found all of them in favor of the children, which has compelled us to review all the issues and a very voluminous record. To make the case intelligent, we feel obliged to set forth rather fully the petition and order of sale, as follows:

PETITION FOR SALE OF REAL ESTATE.

Filed October 21, 1896.

State of Colorado,

ss.

County of El Paso.

In the County Court.

In the matter of the estate
of George Popst, deceased.

Petition for the sale of real estate.

John Nolon as administrator of the estate of George Popst, shows the court: That the amount and value of the personal estate belonging to deceased at his death, as shown by the inventory and appraisement herein, was $4,108.00; that of

said amount, the $108.00 consists of the household goods and furniture which are exempt from sale for the payment of debts; that the $4,000.00 consists entirely of 72,499 shares of the capital stock of The Mineral Rock Mining Company, which stock has no market or salable value at this time, and cannot now be sold or disposed of, although your petitioner has used every effort to secure a sale thereof. That while the stock has now no market or salable value, it has a prospective value by reason of the favorable location of the property, and on this account something is likely to be realized from it for the estate in the future; that for this reason none of the estate's personal property has been sold; that the amount of claims allowed against the estate, and the amount still existing and not allowed, as near as he is able to estimate the same, is about $1,000; but he is unable to state what portion thereof has been allowed.

Decedent died siezed of the following interest in real essate:

1/5 interest in the Cristle Lite lode, value $25.00;

1/4 interest in the Sarah Ann McDonald lode, value $25.00;

1/4 interest in the Flying Cloud lode, value $25.00;

1/2 interest in the Brindsmaid lode, value $25.00;

1/2 interest in the Uncle Sam lode, value $50.00;

1/3 interest in the Little Mary lode, value $25.00;

1/5 interest in the Mollie Gibson lode, value $25.00;

1/5 interest in Old Branch lode, value $25.00;

1/5 interest in Roanna lode, value $150.00;

In the Cripple Creek mining district. That they all consist of mining lode locations only, no patents having been issued for any of them. That he believes it will be to the interests of the estate to have its interest in the Roanna, Brindsmaid and Uncle Sam locations sold by order of court for the payment of debts

for the following reasons: First, because there is no personal property and no funds in the hands of petitioner with which to pay or discharge debts. Second, because said lode mining claims are unproductive, and no revenue can be received from them without much expense, and the assessment work thereon for the year 1896, has not been done, and there is great danger that the estate's interest in the locations may be lost unless the property is sold. That in his judgment, the estate's interest in the claims can be sold to better advantage at private sale than at public auction. That the heirs of decedent are Honora Popst his widow, John F., James, Harry A., Hugh J., Michael, William and Mary Popst, his minor children. Prayer for summons: that he be directed to sell the locations at private sale; that the court aid him in disposing of the property, or otherwise provide for the payment of claims against the estate.

Decree for Sale of Real Estate.

(Filed November 14, 1896.)

State of Colorado,

ss.

County of El Paso.

In the County Court in Probate.

November Term, A. D. 1896.

> In the matter of John Nolon, administrator of the estate of George Popst, deceased,
>
> *Petitioner,*
>
> vs.
>
> Honora Popst, widow, John F., George M., James, Harry A., Hugh J., Michael, William, and Mary Popst,
>
> *Respondents.*

Decree for the sale of
real estate to pay
debts, filed Novem-
ber 14, 1896.

This day comes John Nolon, administrator and petitioner herein, and the respondents John F., George M., James, Harry A., Hugh J., Michael, William and Mary Popst; also come by George W. Musser as their guardian *ad litem,* and file their answer, and the cause coming on to be heard, and it satisfactorily appearing to the court from the records and files herein, that the respondents have been personally served with summons by the sheriff of this county more than ten days before the return day thereof (November 2), thereupon it is ordered that Honora Popst be called, and she being three times solemnly called in open court by the sheriff, comes not, nor any one for her, but makes default, whereupon it is ordered that the petition be taken as confessed against said adult respondent.

And now this cause coming on to be heard upon the petition taken as confessed as aforesaid, the answer of the guardian *ad litem,* and the exhibits, proofs and testimony produced and taken in open court, and it satisfactorily appearing to the court that George Popst departed this life May 15, 1895, leaving Honora Popst, his widow, and John F., George, Harry A., Hugh J., Michael, James, William and Mary Popst, his children and only heirs at law; that petitioner was duly appointed administrator of his estate, and that letters were duly granted to him, bearing date September 30, 1895, and that petitioner has made a just and true account of the condition of the estate to the court, and that the personal estate is insufficient to pay the debts of George Popst, deceased, and the expenses of administration; and it futher appearing, and the court so finding, that the amount of the deficiency aforesaid, is the sum of $135.50, besides accrued interest there-

on, and costs; that the petitioner has made and returned to the court an inventory of the real estate of the deceased, and caused it to be appraised as required by law, the appraised value thereof amounting in the aggregate to the sum of $250.00; and it further appearing that the said George Popst died siezed of the following real estate situated in El Paso county, to-wit: 1/2 interest Brindsmaid, 1/2 interest Uncle Sam, and 1/5 interest Roanna lode mining locations, and the court having ascertained that it will be necessary to sell all the interest of the said estate therein to pay the deficiency aforesaid, with the expenses of administration due and to accrue; and petitioner having filed his bond with surety thereon which is approved and acceptable to the court;

It is therefore ordered that said petitioner sell at private sale, 1/2 interest in the Brindsmaid, 1/2 interest in the Uncle Sam, and 1/5 interest in the Roanna mining lode locations to pay the debts now due from said estate, and the costs of administration due and to accrue.

It being the opinion of the court it would benefit the estate to sell at private sale, it is ordered that said premises be sold upon the following terms: for cash upon ten days' notice in the Morning Times, a daily newspaper of general circulation in El Paso county, which terms shall be distinctly set forth in all the advertisements of sale. And if sold at private sale, the real estate shall not be sold for less than the appraised value of each separate parcel; and in no event shall the petitioner herein, either directly or indirectly become the purchaser of any part thereof. And it is further ordered that upon making such sale, and payment by the purchaser, that petitioner execute and deliver to the purchaser a certificate of sale as in the case of sales of real estate upon execution, and report his action to the court; further that the cause stand continued to the next term for the hearing and action upon the report.

Done in open court the 14th day of November, 1896. On November 27, 1896, the administrator at a duly advertised public auction, on the street in Cripple Creek, sold the estate's interest in the Brindsmaid and Uncle Sam locations to Dodson for $200.00. The sale was approved by the court, and January 4, 1897, the administrator gave Dodson a deed.

2.  Discussion has arisen at the beginning, whether the attack on the county court proceedings, is direct or collateral. This kind of a direct attack is usually brought for the purpose of establishing by evidence *aliunde* the record the untruthfulness of its recitals, and to have the voidable judgment resting upon the untruthful record declared void. If the county court acquired no jurisdiction over the proceedings by petition to sell real estate, or even the person by service of summons, and an inspection of the record disclosed the want of jurisdiction, the judgment was void and could be attacked in any action, either directly, or collaterally, whenever and wherever it was brought in question. If there was any jurisdictional infirmity in the county court proceedings which could only be discovered by evidence *aliunde* the record, then the judgment was not void, but voidable, and was good until set aside, reversed or declared void in a suit brought to try that very issue. Where the issue is, that the judgment is void, the trial is by an inspection of the record. Where the issue is, that the judgment in voidable, the trial is by matters *dehors* the record.—*Kavanagh v. Hamilton,* 53 Colo. 157; *Board of Commissioners v. Platt,* 70 Fed. 567; 52 Cent. Law Jour. 420.

3.  An inspection of the county court record ordering the administrator to sell real estate to pay debts does not disclose that the order was void on account of the failure of the court to acquire jurisdiction over the proceedings. The petition conforms substantially with the statute, and by the great weight of authority was sufficient to invoke the jurisdiction of the court over the proceedings.—*Nichols v. Lee,* 16 Colo. 147; *Bateman v. Reitler,* 19 Colo. 547; *Mortgage Trust Co. v.*

*Redd,* 38 Colo. 458; *Kavanagh v. Hamilton,* 53 Colo. 157; *Manson v. Duncanson,* 166 U. S. 533-547; *Kretsinger v. Brown,* 165 Fed. 612; *Iverson v. Loberg,* 26 Ill. 180; *Stow v. Kimball,* 28 Ill. 108; *Goudy v. Hall,* 36 Ill. 313; *Moore v. Neil,* 39 Ill. 256; *Bradley v. Drone,* 187 Ill. 175; *Salter v. Hilgen,* 40 Wis. 363; *Tallman v. McCarty,* 11 Wis. 401; *Blackman v. Mulhall,* 19 S. D. 534; *Magee v. Big Bend Co.,* 51 Wash. 406; *Burris v. Kennedy,* 108 Cal. 331; *Estate of Devincenzi,* 119 Cal. 498; *Sweet v. Ward,* 43 Kas. 695; 18 Cyc. 771.

Mistakes, errors or irregularities are not jurisdictional, and, though they might reverse a case on review, will not render the judgment void.

In *Nichols v. Lee, supra,* (on rehearing) 154, no inventory and appraisement were filed, and it was contended that the filing of these documents was a condition precedent to the right to sell real estate; but this court held the statute meant that whenever it shall appear *after* and not *by* inventory and appraisement; that *after* was a designation of time, not jurisdictional, fixing the order of proceeding; that a failure to file any inventory and appraisement might be an irregularity sufficient to reverse the case on review, but would not prohibit the court from acquiring jurisdiction over the proceedings; that the petition is in effect a complaint, and is sufficient to confer jurisdiction upon the court if it contains enough to call upon those heirs who are parties, to respond; because nothing is taken as confessed, the court must take the testimony and decide the case on the evidence. The county court is a court of general jurisdiction, and presumably it found from evidence produced on the hearing of the petition, that the personality was not sufficient to discharge the debts against the estate. This finding could not be overthrown or reversed on the trial in the district court by evidence showing that the county court was mistaken.

It is claimed the inventory and appraisement show that the Mineral Rock stock owned by the estate was valued at $4,000.00. They do; but the petition recites that it was the only personal property belonging to the estate, except exempt household goods, appraised at $108.00, selected by the widow at that valuation, as a part of her allowance; that the value of the mining stock was wholly prospective; that it had no market value, and could not be sold at any price. The presumption is that the court heard evidence on this allegation, and found it true, which left the estate with no available assets.

The district court took evidence upon the value of this mining stock to ascertain, as we understand, whether there was a necessity to sell real estate to pay debts when the petition was filed. This it had no right to do, especially in the absence of a direct issue that the finding of the county court was based upon fraud. But waiving the irregularity of admitting this evidence, it shows that at the time the petition was heard, the stock was only worth about one cent or a cent and a half a share. Counsel further claims that the probate files introduced in evidence in the district court show that no claim had been allowed against the estate when the petition to sell was filed. If these files were competent for the purpose of impeaching the findings and judgment of the county court (which we do not decide), still counsel is mistaken as to their effect. The files show that the widow's allowance was fixed at $1,860.00; that the exempt household goods and furniture were appraised at $108.00; that on October 25, 1895, she relinquished her claim to the appraisers' estimate of specific property allowed her as widow's allowance, and, in lieu thereof elected to take the household goods at the appraised value of $108.00, and the balance of the allowance, $1,752.00, in money. This was a year before the petition to sell real estate was filed, and was a claim against the estate, for the payment of which, the administrator, in the absence of personal property from which it could be realized, could resort to the real

estate. The court was not justified in finding the first issue, that the judgment of the county court was void, against the appellants.

4. If in truth the children were not served with process, though the sheriff's return shows, and the order recites they were, then the judgment was voidable as to them, and the court could declare it void in this suit brought for that purpose.—*Kavanagh v. Hamilton,* 53 Colo. 157.

But before the officer's return, and the court recitals could be overthrown, and the judgment declared void, the proof must be clear, unequivocal and convincing; in other words, beyond a reasonable doubt.—*Kavanagh v. Hamilton,* 53 Colo. 157; *Butsch v. Smith,* 40 Colo. 66; *Baird v. Baird,* 48 Colo. 509; 32 Cyc. 517.

At the time of the death of Popst in May, 1895, the children were of the following ages: Mary 3, William 4, Michael 6, Hugh 8, Harry 10, James 11, George 12 and John 16 years. This trial was in April, 1907, twelve years afterward. The sheriff's return shows the summons from the county court was served in October, 1896, almost eleven years before this trial. All the children except the two eldest, George and John, testified and their evidence was intended to show that none of them had been served with summons. In fact James and some of the others stated positively they were not served, and he being the oldest, we will analyze his testimony. He was a mere boy at that time, and it was a long period in a boy's life before this trial occurred. It is unbelievable that at the time he testified, he could by his unaided memory recollect that no summons was served upon him almost eleven years before. When questioned as to how he knew he was not served, he said because on the date of the alleged service, he had taken dinner with Mrs. Derrity, which, with nothing to aid his memory, was even more astonishing. The most charitable view to be taken of such evidence is that he had no recollection of being served, which in fact is the effect of his testimony. After so long a

time it would be extremely dangerous to accept the unaided recollection of any person, to overthrow the findings of a court and the return of a sworn officer, and more especially is this true of the statements of children, who have no conception of court procedure.

The return of the officer showed personal service upon these children; the decree recites they were personally served; the attorney who conducted the proceedings for the administrator, testified that he made previous arrangements with Mrs. Popst, who at that time was friendly to and aiding in the proceedings, to have all the children at home so they could be served; and the officer who made the service testified that he went to their home, found the children there according to arrangements of which he had been told, and served them all personally in the manner designated in the return. The evidence on the trial that the children were not served, was negative in character and was not of that clear and convincing nature required to overcome the positive evidence, taken in connection with the official return and court recitals in the judgment. The district court was not warranted in finding the second issue against appellants.

5. The third issue tried was that the summons was served on the 29th instead of the 22nd of October as shown by the return. The summons was prepared and signed October 20, by the attorneys Seeds & Parker, and October 21, was issued by the clerk of the court. The final clause signed by the attorneys, save their signatures, was typewritten, as follows: "Witness our hands on this 20th day of October, 1896. (Signatures)." The clerk issuing the summons, wrote the following: "Given under my hand and the seal of said court this 21st day of October, 1896. (Signatures and court seal)." The return, excepting the day of the month, is typewritten as follows: "State of Colorado, County of El Paso, ss. I hereby certify that I have duly served the within summons on this 22nd day of October, A. D. 1896, upon the within named de-

fendants, Honora Popst, John F. Popst, George M. Popst, James Popst, Harry A. Popst, Hugh J. Popst, Michael Popst, William Popst and Mary A. Popst, and each of them, by reading the same to them and each of them personally, in the county of El Paso and state of Colorado. W. S. Boynton, sheriff, by J. W. Lupton, deputy." Mrs. Popst testified Lupton came to her home in October, 1896, and served some process, and, while she did not fix the date, an attempt was made to show that it was on the 29th. As the court found against her, and she has assigned no cross errors, we would not consider this question, were it not that all the issues were found in favor of the children, from which it is argued the service on them was on the 29th, notwithstanding the inconsistent position is taken that they were not served at all. The possibility that the court may have declared the judgment void for this reason, compels us to review this matter. The county court was without jurisdiction, under our statute, to try the case on the first day of the term unless respondents were served at least ten days prior thereto. If the service was in fact on the 29th, then the officer's return and the recitals in the order are untrue, the judgment was voidable, and the district court on direct attack could declare it void. It could, however, do this only upon evidence clearly establishing the untruthfulness of the record. No one testified that the service was on the 29th. Plaintiffs' attempted proof consisted of, (1) A certified copy of a record kept in the sheriff's office at Colorado Springs, showing the summons was received and served on the 29th. (2) Records of a livery stable, kept in Cripple Creek, showing that officer Lupton, who made the service, had out a double team on that day from 10 o'clock A. M. to 3:20 P. M. (3) Statements made by Lupton, that whatever the record in the sheriff's office recited, was correct. Under some circumstances, evidence of this character might be admissible for impeachment; but in the first instance an official cannot impeach the return he has made on a writ, by a record kept in

his office. ˙ This court has held that the return is controling, even over the recitals in the judgment, and if defective or erroneous, must be amended. It would be useless to require a return if it could be impeached in another trial by a record kept in the sheriff's office. Conceding the admissibility of a certified copy of such a record, it could have no greater weight than the original, which, while in a proper case it might be admissible for some purposes, could not be used primarily to impeach the return. There was no evidence that Lupton used the rig he obtained on the 29th to make this service. A sheriff's return into court cannot be impeached by his oral statements afterwards any more than can the verdict of a jury by the talk of a gossiping juryman. To uphold such methods would open the door to fraud, and render insecure all legal procedure. When an officer testifies orally in support of his return, which has been attacked, then, upon laying a proper foundation, will be the time to introduce any contradictory records, or prove statements made by him out of court, for the purpose of impeaching his testimony in court. The summons was prepared and issued by Seeds & Parker, attorneys, October 20. The return was typewritten at the same time with the exception and intention that the service would be made on that day. Judge Seeds, a witness for the plaintiffs, testified that the return as originally prepared in his office read: "I hereby certify that I have duly served the within summons on this 20th day of October." That as attorneys they became doubtful of their authority to issue the writ, and to be on the safe side, he went to Colorado Springs the night of the 20th, arriving there the morning of the 21st; had the summons issued by the clerk and returned to Cripple Creek that night, reaching there on the morning of the 22nd, when he gave it to the officer for service. He also testified they had made arrangements with Mrs. Popst to have the children all at home on the 22nd, so they could be served. The original typewritten figures in the return, whatever they had been, were erased with a pen

and ink, and immediately above was written in ink, "22nd." It is claimed that the erased portion was originally "29" and not "20," and that the erasure and interlineation of "22nd" in ink, constitutes an alteration or forgery made after the endorsement of the return. This is a mere conjecture, wholly unsupported by any evidence. The plaintiffs' own witness, who prepared it, testified that it was originally typewritten "20," exactly as in the summons, and explained the necessity for the change. The officer who made the service testified that he received the summons on the 22nd; that he went on that day to Mrs. Popst's home, where he found all the children and served them; that in making the return he erased the typewritten figures 20 or 29, whichever they were, with a pen, and made the interlineation himself by writing the figures "22" above the erased figures, and that it was in this condition when he returned the writ into court. The attorneys knew that the service had to be made at least ten days before the 2nd day of November, and made a special trip from Cripple Creek to Colorado Springs, consuming two days and nights, for the very purpose of having the summons issued by the clerk within time, and it is unreasonable to believe that after going to this trouble and expense, they kept it until the 29th before giving it to the officer. The children were represented on the 2nd of November by an attorney appointed by the court, and if the return then disclosed that the service was on the 29th, it is most singular that it escaped the attention of the court and all counsel. The district court was not justified in finding the third issue against the appellants.

6. In the fourth issue it is contended that Dodson purchased the Brindsmaid and Uncle Sam locations at the sale for the administrator, of which appellants had knowledge. When a judgment is declared void on account of the fraud of a party, in a suit brought for that purpose, the power of the court in granting relief is exerted against the wrongdoer by enjoining him from collecting the judgment, or if he holds property

which he has obtained under it, by compelling a reconveyance. It acts upon his conscience. In this case that could not be done, because the judgment of the county court had been fully executed and the property had passed to third parties who had no part in the original transaction. The court attempted to afford relief to appellees by setting aside all the county court proceedings, all the conveyances thereunder, and the United States patent. This was not proper. We have held many times that the district court is not a court of review. The county court is a court of general jurisdiction, and the district court has no power to review and set aside its judgment. Neither do we think in this case it could or should have cancelled the United States patent to Farnsworth. If it found the county court proceedings were void on account of the administrator's fraud, of which appellants had knowledge when they acquired the Brindsmaid, it could have granted relief by declaring them trustees of a constructive trust, and compelled them to reconvey the legal title to the beneficiaries. If they purchased the property with knowledge of the alleged fraud, then they held the legal title in trust for the equitable owners.

There has been some discussion as to whether this attack upon the county court proceedings on the ground of fraud of the administrator is direct or collateral as to appellants. As to the parties to the county court proceedings, the attack is direct; but appellants' claim as to them, it is collateral. In support of their contention they cite *Moore v. Neil*, 39 Ill. 256, where it is said:

"Where a bill in chancery is filed to set aside an administrator's sale, the proceedings should not, perhaps, be regarded as collateral to the former suit so far as it relates to the parties to that suit, but as to the purchasers, whose title derived from the sale is sought to be divested, it is as purely collateral as an action of ejectment."

Also Kerr on Frauds and Mistakes, page 48, where it is said:

"The transaction being valid until it is avoided, third parties without notice of the fraud may in the meantime acquire rights and interests in the matter which they may enforce against the party defrauded."

And at pages 312 and 313, as follows:

"The right to impeach a transaction on the ground of fraud, has no place as against third parties, who have paid money and acquired a legal right to property, without notice of the fraud. As against a purchaser for valuable consideration without notice, having the legal title, no relief can be had in equity. If a man has paid his money in ignorance of the fact that another party has an equitable claim to the property, a court of equity will not deprive him of the benefit of his legal title, even although his equitable claim be of later date than that of the other party. The rule that a man who advances money *bona fide,* and without notice of the infirmity of the title of the seller, will be protected in equity applies equally to real estate, chattels, and personal estate. The rule is subject to no exception, even in favor of charities."

Also sections 2 and 3 of Van Fleet on Collateral Attack, where it is said: A bill in equity to set aside a judgment for fraud, becomes a collateral attack when it seeks to affect a *bona fide* purchaser under the judgment, that it is direct only when pursued in the time and manner provided by law against one who is not a *bona fide* purchaser.

We do not think it makes any difference in this case because appellees admit appellants were purchasers for value, and that the court could grant them no relief against appellants, unless it found they had knowledge of the fraud. The power to grant relief against appellants turns upon their knowledge of the fraud. This issue then embraces: (1) Proof of the fraud, and (2) Proof of appellants' knowledge thereof.

Appellees admit appellants bought and paid for the property in good faith without actual knowledge of any infirmity in the title; but it is claimed they had constructive knowledge

of the administrator's alleged fraud. Disregarding mere generalities, the specific matters, which it is contended constitute constructive knowledge, are: 1. Deeding the Brindsmaid and Uncle Sam locations to the Shurtloff Company by Vedder, in which Nolon, the administrator, held stock. 2. Deeding an undivided half interest in the Uncle Sam to Nolon by Mrs. Vedder. 3. The relationship and association existing between Dodson, Nolon, Vedder, Becker and Cree. To intelligently understand this claim, one must be familiar with the circumstances connected with the conveyances. Prior to Popst's death, he and Allen each owned an undivided half interest in the locations. Dodson's title originates from two sources. The first is the Allen-Popst deed, in 1895, purporting to convey to him all the title in the Brindsmaid and Uncle Sam. This chain of title runs from Dodson to N. W. Vedder, December 14, 1895; N. W. Vedder to King, trustee, December 14, 1895; King, trustee, to Shurtloff Company, March 3, 1896.

It subsequently developed that this deed in fact only conveyed the Allen interest, although Vedder supposed at the time, that he bought all the title. He learned afterwards that Mrs. Popst had no authority to convey the undivided 1/4 interest belonging to the children, and that there might be a defeasance of the interest of the heirs in the Popst title by an administrator's sale to pay debts. The title to these two locations from this source after passing to the Shurtloff Company, separates, the Brindsmaid going to the appellants and the Uncle Sam to the Blanche Company. The second source of Dodson's title begins January 4, 1897, in an administrator's deed to the Popst undivided half interest in both locations which was the interest he failed to get by the Allen-Popst deed. From this source of title Dodson conveyed the Brindsmaid to the Shurtloff Company February 1, 1897. This converged the chain of title to the Brindsmaid from each source, into the Shurtloff Company, from which it runs: Shurtloff

Company to Carnduff, Feb. 1, 1897; Carnduff to Farnsworth, February 24, 1897; U. S. patent to Farnsworth, June 3, 1899; Farnsworth to Pinnacle, March 1, 1901; Pinnacle to Flying Cloud (a part), March 9, 1901.

The Uncle Sam not being involved in this appeal, we would say nothing further about it, were it not that the contention is made that its conveyance throws light upon the transaction. We have already seen that the Allen title to the Uncle Sam, acquired by Dodson by the Allen-Popst deed, reached the Shurtloff Company through a conveyance from N. W. Vedder. After Dodson received the administrator's deed conveying the Popst undivided half of the Uncle Sam, he conveyed this title to it, acquired through the administrator's sale, to Mrs. J. E. Vedder, wife of N. W. Vedder, April 28, 1897, and she on the same date, deeded it to Nolon. The title to this Popst half interest then runs: Nolon to Creighton, December 17, 1897; Creighton to Carlton, October 31, 1897; Carlton to Blanche Company, November 6, 1899. The title to the Uncle Sam derived from the administrator's deed never was conveyed to the Shurtloff Company. The title through the Allen-Popst deed to the Allen undivided half of the Uncle Sam we trace to the Shurtloff Company. It then continues: Shurtloff Company to Mrs. J. E. Vedder, April 29, 1899; Mrs. J. E. Vedder to Carlton, April 23, 1899; Carlton to the Blanche Company, November 6, 1899. In September, 1895, Allen and Mrs. Popst deeded the Brindsmaid and Uncle Sam to Dodson. The evidence shows that N. W. Vedder bought these locations from Dodson for $800.00, which he paid in currency, and that Vedder thought he owned all the title. Nolon, Becker and Cree owned a patented lode called the Shurtloff. They all entered into a mutual agreement to deed these claims to a corporation in which each would receive stock representing his interest. The Shurtloff Company was formed sometime in the winter of 1895-6, to which Vedder deeded the Brindsmaid and Uncle Sam, and under the agree-

ment received 250,000 shares of stock. Nolon, Becker and Cree deeded the Shurtloff lode to the Shurtloff Company under agreement, and took stock. The Shurtloff claim was a patented lode, beyond any annoyances of conflicts and adverses, and Vedder agreed to put his locations on an equal footing by patenting them and giving a clear title. If he did not, or if anyone became dissatisfied with his title, it was a part of the agreement that all the claims should be deeded back to the original owners. Becker, hearing of the defects in Vedder's title, and rumors of adverses, became dissatisfied, and asked that the properties be reconveyed, which was done in the following manner: The Shurtloff Company deeded back to Nolon, Becker and Cree each an undivided 1/3 in the Shurtloff lode. The mere legal title to the Brindsmaid and Uncle Sam stood in the Shurtloff Company, it did not own them. These locations, after the agreement was rescinded, belonged to Vedder, and he could cause them to be deeded to whomever he pleased. He sold the Brindsmaid to the Pinnacle Company for $2,000.00 and caused the Shurtloff Company to make the deed to the purchaser. This $2,000.00 belonged to Vedder, and he received the money. The Shurtloff Company, Nolon, Becker or Cree received no part of it. Vedder then gave the Uncle Sam to his wife, and had the deed made to her. In this way all the parties to the agreement received their original properties. When Vedder learned the Popst interest in these locations was to be sold at an administrator's sale, he knew it would perfect his title to have Dodson purchase it, and while there is no evidence showing it, it is only natural that he should want him to do so. Dodson bought them at a public, not a private sale, as argued, in which all persons had an equal opportunity to participate, and paid the administrator $200.00 in cash for them. Of course the purchase was intended to perfect Vedder's title. Dodson's intent in bidding in the property, does not make the sale fraudulent, and is immaterial. The intent with which one bids at a pub-

lic sale, ordinarily at least, cannot invalidate the sale. After Dodson received the administrator's deed, Vedder had him convey the title from this source to his wife, to perfect the title he had given her. Vedder owed Nolon $1,700.00, and Nolon agreed to cancel the debt for an undivided half interest in the Uncle Sam, and this was the consideration for which Vedder had his wife deed a half interest to Nolon. Nolon sold this half interest to Carlton for $2,500.00, got $500.00 in cash, and a note for $2,000.00, payable in one year. Carlton promoted the Blanche Company, to which he deeded the Uncle Sam, and succeeded in paying his $2,000.00 note to Nolon with Blanche Company stock. The other undivided half interest in the Uncle Sam, Vedder sold to Carlton, to whom his wife deeded, and Carlton conveyed the property to the Blanche Company.

The evidence only raises a suspicion that Dodson, in bidding at the administrator's sale, was purchasing for Nolon. The inference is drawn from the subsequent conveyance to Nolon and to the Shurtloff Company, in which he had stock. The undisputed evidence shows that Nolon was a *bona fide* purchaser of the half interest in the Uncle Sam which he bought from Vedder; and though he was a stockholder in the Shurtloff Company, he received no interest in the Brindsmaid, and no part of the consideration for which it was sold. When these matters of suspicion and inference are explained by the undisputed evidence, any presumption of knowledge arising from the conveyances, vanishes. If the Shurtloff Company in fact owned the Brindsmaid and sold it to the Pinnacle Company for $2,000.00, which was paid to the Shurtloff, it seems as though it would have been impossible to so cover up the transaction, that no evidence of it could have been discovered. Appellees produced no other evidence; but rested this issue solely upon the inference arising from the conveyances, and then themselves destroyed the inference by oral testimony. It is claimed in argument that these parties were all partners in

the Nolon club room, which circumstances makes the transaction look suspicious. The evidence shows that Nolon was the owner of the club room; that Vedder worked for him on a percentage, and that none of the others had any interest in it. Dodson, when he first bought the locations, was not working for Nolon as claimed, and scarcely knew him. Nolon, Becker and Cree were not partners in any business. They owned the Shurtloff lode together, but that could not be called a partnership. Appellants were purchasers for value, and while the law is, if the administrator's fraud, of which they had knowledge when they bought the property, vitiated the sale, equity will bind their consciences and declare them trustees of a constructive trust, and compel them to re-convey, appellees failed to sustain this issue. Appellants paid $2,000.00 for the property in good faith, after diligently investigating the title. They had no actual knowledge of the alleged fraud from any source. If we concede the administrator's alleged fraud, appellees are without relief against appellants, unless the evidence satisfactorily shows they had constructive knowledge; that is, information which if pursued with reasonable diligence would have led to actual knowledge. It will not be presumed that any reasonable investigation appellants might have made would have led them to the discovery of any more or different knowledge than appellees proved on the trial in attempting to establish constructive notice. If the court found the fourth contention in favor of appellees, it was not warranted by the evidence.

The judgment will be reversed and the cause remanded.

*Reversed.*

Mr. JUSTICE GABBERT and Mr. JUSTICE WHITE concur.